# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | DOCKET NO. 1:24-CR-362 |
| *Plaintiff* | : | |
| v. | : | |
| | : | |
| TYLER HENSON | : | |
| *Defendant* | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

**AND NOW**, comes the Defendant, Tyler Henson by and through his counsel, Jonathan R. White, Esquire, and submits the following Sentencing Memorandum, respectfully requesting the Honorable Court consider the information submitted herein.

I. **Procedural History**

On August 7, 2024, Information was filed wherein the defendant was charged with Entering and Remaining in a Restricted Building or Grounds (Count 1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds (Count 2), Disorderly Conduct in a Capitol Building (Count 3), and Parading, Demonstrating, or Picketing in a Capitol Building (Count 4) at the above-captioned docket number. On October 11, 2024, Mr. Henson pled guilty to Counts 3 and 4 of the Information. Sentencing is currently scheduled before Your Honor on January 17, 2025.

1

II.   Argument

A. Section 3553(a) Factors

In accordance with Booker, this Honorable Court is directed to undertake a three (3) step process to impose a sentence: "(1) calculate the applicable Guidelines range, (2) formally rule on any departure motions, and (3) exercise its discretion in applying the factors set forth in 18 U.S.C. §3553(a)." United States v. Grier, 585 F.3d 138 (3d Cir. 2009). The ultimate goal in sentencing is for the Court to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing set forth in 18 U.S.C. §3553(a)(2).

Your parents are there to help you grow. They help mold you into the person you will be and hope to become. As we reach adolescents and grow into young adults, our experiences from our childhood show themselves in our daily life.

Tyler Henson is a 31-year old man living in the Chambersburg, Pennsylvania area. He was born in Chambersburg and found his home there. He has one older sister, Brianna, who is 32 years old. They were not always close growing up. Mr. Henson and Brianna always have had the brother/sister rivalry, but they know they are always there for each other. Mr. Henson also had a younger sister, Samantha, who died at birth. Mr. Henson was very young and did not remember much of the incident; however, he remembers the negative effect it had on his mother.

Mr. Henson was raised by his parents John ("Chris") and Sherri. His mom lives in Aspers with her new husband Donald ("Donnie"). His father lives in Chambersburg. His parents spit up when he was about 2-3 years old. In the beginning, Mr. Henson recalls that his relationship with Donnie was not good; however, he admits that was somewhat his fault too. Mr. Henson admits that he did not treat Donnie with the respect he deserved, he's realized the error of his actions, and the two have mended fences and have a good relationship.

Throughout his childhood Mr. Henson suffered from constant mental abuse. He recalls it being "very hard" growing up. His mom and Donnie had one way of parenting, and his dad had another way of parenting. He recalled being rebellious when he was young. He did not like and could not deal with the change. Like any child, especially one of divorce, he sought stability and strived to find his comfort zone. Mr. Henson acknowledges that to this day his trying to learn to be better at accepting change, but acknowledges it comes hard for him. He recalled, "I'd get mad or upset at one parent and then go live with the other, until I got mad at them and moved back with the other. I just bounced back and forth." His mom had "mental problems and didn't know how to control it" according to Mr. Henson. Once she sought counseling it got better. When she lost her child she was not the same and her mental issues became exacerbated. Additionally, the environment around his mother's home was not ideal for a young, developing child. His mom

3

and Donnie ran a porn site and were swingers. While Mr. Henson was not exposed to any of it, he knew it existed and certainly had an impact on his upbringing.

His father wanted him to go see a therapist because at a younger age, Mr. Henson wanted a lighter like some older kids he knew. His father had concerns and sent him to a therapist. The therapist would tell his dad everything that was discussed and that led to Mr. Henson getting in trouble at home. This obviously had a large impact on Mr. Henson's trust on his therapist, his father, and others in general. Sadly, Mr. Henson does not believe his dad acted much like a dad; rather, "he acted more like a financial support giver." He believes his dad tried when he was young, and certainly tries now, but feels like it is too late now. Mr. Henson sees his dad as very short tempered and inpatient. Growing up, nothing was good enough. He recalls that "growing up, me and my sister were supposed to be good at everything, and if not, it was unacceptable, but he never had patience to teach or show us." As a result, "it causes me now to hesitate to try things because I'm afraid to try new things because I don't want to fail and I don't like to be a failure." Despite that attack on his self-confidence and mental abuse, Mr. Henson never sought counseling for these issues. He learned to cope and to "just deal with it." He has become complacent with lack of change in his life. He understands that, "I'm okay with not having change. Obviously there will be some, but anything out of my control, I just accept it."

Some good change in his life has been his wife Marissa and his stepdaughter Layla (9 years old). Layla's father is not in the picture. In fact, Marissa was required to obtain a restraining order for him where they lived in Minnesota. After being together about 3-4 years, Marissa and Mr. Henson got married a few months ago on October 31, 2024. Marissa and Layla have not only been a huge amount of support in his life but a driving force of him staying on the right path and his day-to-day happiness. His relationship with Layla is excellent! She never had real structure in her life, and is your typical 9 year old, but "she loves me and I love her. She calls me dad and I call her my daughter."

Mr. Henson grew up attending Green Castle High School until his 11th year. He hated school and hated being around his dad, so he decided to drop out. As a result he moved and lived with his mom. However, his mother, not fond of his decision to drop out, forced him to reenroll in school in Biglerville. He graduated in 2013. Mr. Henson did not like school. This stemmed from him "not being good at it" and having learning difficulties. He had issues recalling things he read, and still has some struggles to this day. It became very frustrating, he became defeated, and in turn he did not like school. He always tried but could not do well. He had IEPs and actually excelled at psychology and history courses, but nothing else. He had only 3 friends in school—only 2 of which he still maintains limited contact with. This is mainly due to distance and his life of family and work.

While school may have been problematic for Mr. Henson, work has not been. Mr. Henson has always found a way to work and enjoys working. His first job was around 16 years old where he worked at an Arby's in Greencastle, Pennsylvania. While in High School he also worked at a Wendy's for a few years. After High School, he went to work at Modern Door Equipment and Sales with his uncle in White Plains, Maryland. At Modern Door he would go large jobs and hang large doors. His work ethic was shown through this job. Mr. Henson would wake up around 2AM and leave his mother's house and go to his uncle's house. There he would load supplies into the truck, drive 2-hours to the city, work mostly government job locations for approximately 8-hours, drive 2-hours back to his uncle's house, and then 45-minutes back to his mom's house. Despite this very long, exhausting day, Mr. Henson would only be paid for his 8-hour, on site work. After working there for approximately 1-year, he got hurt on the job and had a hernia. He required surgery, his employers were not happy and let him go.

After Modern Door, Mr. Henson worked some fast food restaurants, mainly at Arby's in Chambersburg and Carlisle, for approximately 4 years. In 2015, Mr. Henson began working with his father at Henson Collision Center as a shop technician. He learned on the job and enjoys his work. Although his father owns and runs the business, he can only make very small business decisions.

### B. Mr. Henson's Actions on January 6, 2021

The events of January 6 will certainly never be forgotten. It is a dark and troubling event for our Country and Mr. Henson is a part of that. He cannot and will never escape that. While he was a part of this tragic event, it is important to remember his actions that day.

Mr. Henson never intended to go to the Capitol to cause violence, trespass, or incite any riot. Rather, he held beliefs that Donald Trump won the election, that there were still legal, non-violent courses of action that could be taken, and that those actions would occur on January 6 via peaceful protests. Mr. Henson was not associated with any extremist organization such as the Proud Boys or Oath Keepers. He did not travel to D.C. with a plan or the intent of insurrection. Furthermore, he did not go to D.C. armed with any weapons or instruments of destruction. He went with a backpack, curiosity, and desire to join a peaceful political rally.

Mr. Henson wished to attend the protests but did not have a ride. His cousin, and co-defendant, was planning on attending and offered to drive Mr. Henson to the Capitol. While at the Capitol, Mr. Henson and his cousins heard a part of Donald Trump's speech, and they left to find a bathroom and some food. When asked about his thoughts from the President's speech, Mr. Henson stated, "I didn't think much of a reaction. I just heard a man talk and that was it. It wasn't

something motivational or made me want to do something. I was just listening to somebody talk." After eating, they made their way to the Capitol where they had learned that people had been attempting to breach the doors.

Mr. Henson had his backpack with him, that had first-aid kit equipment in it, and they went to the Capitol doors initially to just see what was occurring. While there, Mr. Henson got an up-close, first-hand experience of the chaos. While tear gas was deployed, shouting ensued, and people were pushing towards the Capitol doors, Mr. Henson did assist at least 2 other protesters who had been injured. He helped wash the eyes out of one man who had difficulty seeing from tear gas, and he helped another protester who, somehow, had a bleeding hand.

As the riots ensued, Mr. Henson is observed on cameras standing in a corner by Capitol doors. (See Doc. 38, p. 4, Image 2). While his time on camera is very short, he is not seen screaming, yelling, inciting, or taking any action. Rather, he is standing observing the events around him. Once people begin to breach the doors, Mr. Henson does go inside. You see through cameras that Mr. Henson enters at 2:50 PM and remains in the building for 27 minutes until his exit at 3:17PM.

Mr. Henson's entire time inside the Capitol is caught on video and his actions are very telling of his intentions and what he did that day. Through the entirety of his time inside the Capitol, Mr. Henson is seen conversing, calmly, with a police officer. While there is no audio, the video depicts Mr. Henson talking with

the officer in what appears to be a very normal conversation. Mr. Henson explains that at this time he discussed with the officer topics on how crazy the day's events were, if the officer needed anything, and what was actually going on inside the Capitol. During this time, Mr. Henson also took a facetime phone call from his mother, which is seen on video. She had called out of concern and curiosity about what was occurring and what she saw on the news. Mr. Henson explained that even during this time the police officer made a statement to Mr. Henson's mom and had a very short and pleasant interaction. When it was time to leave, Mr. Henson recalled that the officer told him and others around him that they got an order that "alright guys, we got the order, time to get everyone out of here." It is then clearly seen on the video that Mr. Henson walks out while the officer has his hand around his shoulder. This is not viewed in an aggressive or forceful way; rather, it is done in a friendly and comforting way. During this time Mr. Henson is thanking the officer for what he is doing in his service and his friendly conversation and Mr. Henson is observed walking out of the Capitol without issue. Once outside, Mr. Henson searched for his cousins, and then left the Capitol to head home within minutes. At no point throughout Mr. Henson's presence at the Capitol is he seen or alleged to have caused any damage to anyone or anything. He is never seen acting any way that could be argued as violent or aggressive. Rather, Mr. Henson followed the crowd. He let his curiosity and naivety take the better of

him. Mr. Henson admonishes any violent action that was taken at the Capitol. While Mr. Henson has a strong political belief that differs from others, he never believes that any reaction should result in destruction or violence. His belief and goals fall squarely within peaceful protests.

### C. Mr. Henson's life post January 6, 2021.

Although investigations were conducted immediately, Mr. Henson was not contacted by agents until 2022. Mr. Henson was contacted by Agent Allakhverdoc out of Philadelphia and Mr. Henson cooperated immediately and fully. Mr. Henson told the agent when he got to D.C., how he got there, where he went, who he was with, what he did, and what he saw. Over his 30-60 minute in person meeting, Mr. Henson explained a detailed timeline of what he knew to assist law enforcement in any way he could. Included with this is when Mr. Henson learned of charges against him for the within matter. Despite being contacted by an agent nearly 1 year after the incident, and hearing nothing from law enforcement for an additional 2 years after that, Mr. Henson continued to live his life. He never picked up new criminal charges, attempted to flee, or engage in other behavior to justify his actions on January 6. On May 28, 2024, an arrest warrant was signed for Mr. Henson on four misdemeanor charges. Mr. Henson immediately reached out to undersigned counsel and scheduled a surrender date for himself in the Middle District of Pennsylvania. Two days later, on May 30, 2024, Mr. Henson appeared

with counsel in the Middle District of Pennsylvania to address the warrant and was granted release on pre-trial supervision. He appeared by video on June 20, 2024, for his video arraignment in D.C. Despite this June 20 arraignment, communication was already held with the AUSA, on June 3, 2024, about a resolution and plea to the within matter. This not only shows Mr. Henson's willingness to accept responsibility for his actions, but his *immediate* willingness to do so—6 days after his warrant was signed. After reviewing discovery and time to discuss the legalities of the matter, Mr. Henson signed a plea agreement on September 11, 2024. This timeline clearly illustrates Mr. Henson's immediate acceptance of responsibility with less than 3.5 months from him being charged until his signing of a plea agreement. Additionally, it is noteworthy that despite President Trump's statements regarding pardons of all January 6 defendants, Mr. Henson has not attempted to request any delay of his matter. This is because he knows the importance of these events, his part in them, and how much his actions of accepting responsibility show on his character and how those reflect on those close to him.

> **D. A sentence of probation is appropriate given the nature and circumstances of his actions, and those of similarly situated cases.**

Mr. Henson took part in one of the darkest times in our Nation's great history and for that he immediately took responsibility; however, the Court should take note to what his actual part was. Mr. Henson's case is similar to that of many

Case 1:24-cr-00362-JMC   Document 50   Filed 01/06/25   Page 12 of 15

others who have been sentenced by this Court. For instance, in *United States v. Ramakrishnan*, 1:23-CR-247 (JMC). Mr. Ramakrishnan entered and remained in the building for just over twenty minutes. Mr. Ramakrishnan pled guilty to one count of Parading, Demonstrating or Picketing in a Capitol Building in violation of 40 U.S.C. §5104 (e)(2)(G) and was sentenced to six months probation. In *United States v. Parks*, 1:21-CR-363 (CJN), Ms. Parks entered and walked around for 15 minutes before exiting with no confrontation. She pled guilty to one count of Parading, Demonstrating or Picketing in a Capitol Building in violation of 40 U.S.C. §5104 (e)(2)(G) and was sentenced to twenty-four months probation. In *United States v. Bustle*, 1:21-CR-238 (TFH), entered and remained inside the Capitol building for approximately twenty minutes. Mr. Bustle pled guilty to one count of Parading, Demonstrating or Picketing in a Capitol Building in violation of 40 U.S.C. §5104 (e)(2)(G) and was sentenced to twenty-four months probation.

Furthermore, Mr. Henson's actions are less culpable than those of Raechel Genco and Levi Gable. In *United States v. Genco*, 1:22-CR-62 (JMC), Ms. Genco stormed the Capitol grounds for over an hour, did not engage in any violence herself but held her boyfriend's items while he confronted police officer with a flag he brandished as a weapon. Ms. Genco pled guilty to one count of Parading, Demonstrating or Picketing in a Capitol Building in violation of 40 U.S.C. §5104 (e)(2)(G) and was sentenced to twelve months probation. In *United States v. Gable*,

12

1:22-CR-189 (JMC), Mr. Gable remained inside for over 30 minutes where he participated in the mob, confronted and pushed past police inside, and was a part of the mob that threatened Speaker Nancy Pelosi. After pleading guilty to one count of Entering and Remaining in a Restricted Building in violation of 18 U.S.C. § 1752(a)(1), he was sentenced to twenty-four months probation.

    Mr. Henson does not need any additional deterrence. His charges have been publicized locally and has certainly brought him embarrassment. But it is also important to acknowledge that Mr. Henson has no prior record before this incident and has not had any contact with law enforcement since the incident. Mr. Henson has learned a very significant life lesson from his actions, one that will never be forgotten. He is a non-violent person who spends his time with his family and at work. There is no need for the Court to impose a sentence of incarceration to protect the public from further crimes. While the court has discretion for the imposition of sentencing in this matter, Mr. Henson does request that if incarceration is ordered by the court, that he be permitted to serve such through home confinement. His wife and daughter rely on his income and involvement for day-to-day needs. He has learned that his thoughts and beliefs, while valid, can be addressed in a different and safer way. He has learned to be more aware of the volatility of situations, especially political ones, and how he simply needs to merely remove himself from similar type situations. He wishes to see changes in

the government, more global, humane changes. He wishes to be part of those positive changes that plague society (hatred, racism, classism), but he has learned different ways that can be achieved from home and in ways that could never result in violence. Mr. Henson's free time consists of being either at home or at work. He enjoys cleaning and organizing his house, being a husband and parent, working, and playing video games. He asks this Court to see the person he has shown himself to be for his entire life and not the dark mark he left on the world for those 27 minutes.

### III.  Conclusion

For the reasons set forth above, Tyler Henson, respectfully requests This Honorable Court consider the forgoing information when deciding upon an appropriate sentence and sentence him to a term of probation with any conditions the court deems appropriate.

Respectfully submitted,
**Dethlefs-Pykosh Law Group, LLC**

Date: January 6, 2025

/s/*Jonathan R. White, Esquire*
Jonathan R. White, Esquire
2132 Market Street
Camp Hill, PA 17011
(717) 975-9446
jwhite@dplglaw.com
Attorney I.D. # 313808

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | DOCKET NO. 1:24-CR-362 |
| *Plaintiff* | : | |
| v. | : | |
| | : | |
| TYLER HENSON | : | |
| *Defendant* | : | |

## CERTIFICATE OF SERVICE

I, Jonathan R. White, Esquire, hereby certify that on this 6th day of January 2025 a true and correct copy of the foregoing Pre-Sentencing Memorandum was served upon the party named below via electronic delivery addressed as follows:

**Nialah Ferrer, Esquire**
United States Attorney's Office
601 D Street, NW
Washington, DC 20579
Email: Nialah.ferrer@usdoj.gov

/s/Jonathan R. White_____
Jonathan R. White, Esquire